**Earl MEADOWS et al., Appellants,**

v.

**Willie BAILEY, Adm'r, of the Estate of Bobby Bailey, Deceased, Appellee.**

Court of Appeals of Kentucky.

Oct. 27, 1961.

Boyd F. Taylor, Hamm, Taylor & Milby, London, for appellants.

Calvert C. Little, London, for appellee.

PALMORE, Judge.

Bobby Bailey, while driving an automobile, was fatally injured in a sideswipe collision with a truck driven by Earl Meadows, a 17-year old boy. In this wrongful death action Bailey's administrator recovered judgment on a $5,000 jury verdict rendered jointly and severally against Meadows and against Earl Bowling and wife, Ethel Bowling. The case against the Bowlings rests on the theory that they owned the truck, permitted Meadows to use it, and are liable under KRS 186.590(3). All three defendants appeal.

The accident happened on Kentucky Highway 30 a mile or so east of East Bernstadt in Laurel County. It was late afternoon, "right at the edge of dark." The road was a two-lane pavement with a broken white line marking its center. It was dry. Bailey, driving east, was either rounding or emerging out of a slight curve to his right when he met the Meadows truck coming west. The left front portions of the two vehicles collided. Evidently both spun counterclockwise, the truck coming to rest off the highway on the north, headed back toward the east, and the car crosswise in the road, headed slightly northwest. There were no tire marks. Dirt and debris were deposited all over the pavement. Some of the witnesses said that "most" of it was in the south or east-bound lane. A piece of Bailey's clothing was found on the left front corner of the truck bed. These are the physical facts.

There were four passengers in the Bailey car, one of whom apparently had passed out drunk in a pool room at East Bernstadt and was being driven home by Bailey. Of the occupants of this car the only one to testify was Charley Houston, who was sitting in the back seat directly behind Bailey, the driver. He said that there was whiskey in the car but he had not drunk any, nor, so far as he knew, had Bailey. According to his account the Bailey car was going 35 to 40 m. p. h. and remained within the right-hand lane at all times. Admittedly, however, he could not see the center line but "was just kindly judging." He first noticed the truck when it was 40 to 50 feet away and "it looked like he was coming right at us," whereupon he called out a warning to "watch it" and Bailey swerved to the right, but to no avail. Houston was knocked out and remembered no more about the accident. This witness had been twice convicted of felonies.

The only other eyewitnesses were Meadows, who was driving the truck, and Charles Gurley, who was riding with him. They were following a car driven by Charles' half brother, Herschel Ward. Both Meadows and Gurley testified that the truck was on its right side of the road. According to Meadows, the Bailey car nearly crowded Ward off the road before it hit the truck, and Ward testified to the same effect. Ward heard the crash, stopped his car and ran back to the scene of the accident. Meadows and Gurley got out of the truck, evidently unhurt, and proceeded to leave the scene in Ward's automobile before any other witnesses arrived. It was claimed that the purpose of Meadows and Gurley in leaving was to call the police. Ward stayed behind and pretended to have been driving the truck himself. Since all of the occupants of the Bailey car had been rendered insensible, either by the force of the collision or by extraneous influences, this ruse had an early success. However, the truth was unearthed through the diligence of the state trooper who investigated the accident, and Meadows, after denying it for several days, finally pleaded guilty in county court to a charge of driving without an operator's license. His explanation was that he did not have permission from the Bowlings to drive the truck and did not want them to know it.

The facts summarized thus far are sufficient for decision of whether the evidence supports a finding of negligence against Meadows. We think it does.

To nullify the testimony of Charley Houston appellants cite the rule expressed in Davis v. Bennett's Adm'r, 1942, 289 Ky. 516, 159 S.W.2d 39, that when the physical facts point so unerringly to the truth that there is no room for a reasonable difference of opinion they will override testimony to the contrary. But in this case there was no such physical evidence. Certainly the relative positions of the two vehicles afterward do not, of themselves, tell us where they were with respect to the center of the road when they met. Steely v. Hancock, Ky.1960, 340 S.W.2d 467, 470. Therefore, the question is whether there was enough credible evidence to sustain the burden of proof.

On this point the plaintiff's case consists of the testimony of Houston, the testimony that "most" of the debris was deposited in the east-bound traffic lane, and the conduct of Meadows following the accident. When a collision has occurred near the middle of a highway, evidence that a preponderance of the debris fell on one side or the other of the center line has little or no probative force. For example, it may well indicate no more than which of the vehicles was the dirtier, or the more easily shattered. Nor do we attach any great significance to the conduct of Meadows following the accident. Ordinarily a party's attempt to conceal or suppress a relevant fact has probative value, and is thus admissible, because it is in the nature of an admission of the weakness of his case. See II Wigmore on Evidence § 278, p. 118. But quite aside from the matter of who was at fault in the accident, there were other circumstances furnishing so much more probable a motivation for the attempted concealment that it would hardly be fair to give his equivocal conduct much weight on the question of negligence. So we come to the testimony of Houston as the real basis for the verdict.

Some of the witnesses said that Houston was drunk or had been drinking. He denied it. That was for the jury to decide. He had been convicted of felony, but again it was the jury's prerogative to judge his credibility. That he could not actually see the center line of the road reflects upon the exactitude of his judgment, yet we are loath to say that the occupant of an automobile cannot judge whether it is or is not wholly within its proper lane of traffic simply because he does not see the center stripe. That too falls in the jury's province. We hold that the eyewitness testimony of Houston was enough to take the case to the jury and permit a finding of negligence.

There was a conflict in the evidence as to whether Bobby Bailey had been drinking just before the accident. Among the instructions offered by the appellants were the following:

"9–A 'Negligence' as used in these instructions means the failure to exercise ordinary care. 'Ordinary care' as used in these instructions means that degree of care that an ordinarily prudent person would exercise under the conditions and circumstances similar to those proven in this case, and if you believe either driver was intoxicated, the phrase 'ordinary care' means that degree of care which ordinarily prudent persons, if sober, usually exercise under the same or similar circumstances to those proven in this case."

"12–A If the jury believe from the evidence that at the time of the accident, the plaintiff's decedent, Bobby Bailey, either through intoxication or otherwise, failed to exercise such care for his own safety as an ordinarily prudent person, if sober, would have exercised under the same or similar circumstances, and that such failure, if any, so contributed to his death, but for which he would not have been killed, the law is for the defendants and you will so find."

The latter of these, 12A, is substantially the same instruction offered by the defendant in Louisville & N. R. Co. v. Payne, 1907, 104 S.W. 752, 31 Ky.Law Rep. 1173, in which case a bibulous passenger, after getting off on the wrong side of a train, fell down and had his fingers crushed under the wheels. The trial court's refusal to instruct to the effect that the law exacts from a voluntarily intoxicated person the same degree of care as is expected of a sober person of ordinary prudence under like circumstances resulted in reversal of a judgment for the plaintiff. To the same effect see Wootton v. Dixon, 1950, 312 Ky. 521, 228 S.W.2d 428, another falling down case. In neither of these two cases, however, had the trial court given any instruction at all on the subject of intoxication, whereas in the instant case the court did instruct as follows:

"The phrase 'ordinary care,' if you believe either driver was intoxicated, means that degree of care which ordinarily prudent persons, if sober, would duly exercise under same or similar circumstances to those proven in this case."

■ As we see it, this instruction covered the subject adequately. Since there was no evidence that Meadows was intoxicated it might better have followed the form set out in Stanley's Instructions, § 589, and omitted the reference to "either driver," but this phraseology was invited by appellants' use of it in their offered instruction 9A. There is, however, a more cogent reason why they were not entitled to their offered instructions. In this case, as in the recent case of Barker v. Sanders, Ky.1961, 347 S. W.2d 529, the whole issue of negligence hung on the determination of one fact: Which party invaded the right-of-way of the other? In such a case there is no necessity for cluttering the instructions with enumerations and definitions of duties other than the particular duty involved, which necessarily covers all the others. In this case it was the duty of each driver in meeting the other to keep his vehicle to the right hand side of the highway. The evidence disclosed no reason or excuse for any failure to do so. Neither party was incapable of negligence. Therefore, on that question it was unnecessary that the instructions go beyond saying simply that it was the duty of each of the two drivers, on meeting the vehicle of the other, to keep his vehicle to the right hand side of the highway; if Bobby Bailey failed to do so and his automobile was not wholly on its right hand side of the highway at the time of the collision, then the jury should find for the defendants; but if, on the other hand, Earl Meadows failed in this duty and the truck being driven by him was not wholly on its right hand side of the highway at the time of the collision, then the jury should find for the plaintiff *unless* neither one of these two vehicles was wholly on its right hand side of the highway at the time of the collision, in which event the jury should find for the defendants.

■ We come now to the question of whether there was sufficient evidence to support the verdict against the Bowlings under KRS 186.590(3), which provides as follows:

"Every motor vehicle owner who causes or knowingly permits a minor under the age of eighteen to drive the vehicle upon a highway, and any person who gives or furnishes a motor vehicle to the minor shall be jointly and severally liable with the minor for damage caused by the negligence of the minor in driving the vehicle."

The truck being driven by Meadows at the time of the accident was registered in the name of Ethel Bowling but actually was used and managed exclusively by her husband, Earl Bowling. Ethel did not even have a driver's license. The Bowlings lived on a farm at Dog Patch, two miles from East Bernstadt on U. S. 25. Earl Meadows, their nephew, lived with his parents in the same neighborhood and did various chores for Bowling, who, in addition to farming, operated a taxi, owned two trucks in which he engaged in the hauling of coal, and held the elective office of constable. On the afternoon of January 10, 1959, just before Bowling was to depart from East Bernstadt on a daily scheduled taxi run to London, Herschel Ward, another nephew, asked for the loan of one of his trucks in order to start Ward's car, which was stalled at Ward's mother's place in East Bernstadt. Bowling took Ward and the latter's wife to the Bowling farm, where the truck involved in this case was then parked, and immediately left on his taxi trip to London. It happens that at this time Earl Meadows was in Bowling's barn feeding the livestock, but Bowling did not see him. Ethel Bowling was at her place of employment in London. After Bowling left, and while Ward was "warming up" the

truck, Meadows came up from the barn. Instead of going on home, he accompanied the Wards in the truck to East Bernstadt to help get Ward's car started. This was done by hitching the car behind the truck and pulling it. At Ward's suggestion Meadows drove the truck and Ward occupied the car. Ward's half brother, Charles Gurley, rode with Meadows. They drove east on Kentucky Highway 30 until they succeeded in starting the car, after which the tow-line was detached and they turned around and started back to East Bernstadt, the car preceding the truck. It was during this journey that the collision with Bailey occurred. Neither of the Bowlings had any foreknowledge of Meadows' participation in these events.

There was no evidence that either of the Bowlings ever had given Meadows express permission to make such use of the truck as would cover this occasion. The appellee contends, however, that such permission was implied from previous conduct and that his authority to use it in this instance was further perfected by ratification.

Both Bowling and Meadows testified that Meadows had been allowed to drive the truck on the farm but had never been permitted to drive it on the highway and had never done so with Bowling's knowledge. On the other hand, witnesses for the plaintiff said that on several occasions within four months or so prior to the accident they had seen Meadows, sometimes accompanied by Bowling himself, driving the truck to or from the coal tipple at East Bernstadt, and that he had driven Bowling's other truck on various occasions after the accident. In his argument for ratification appellee attaches considerable significance to the fact that following the accident Bowling made no complaint and took no punitive measures against Meadows for having driven the truck without his consent but, on the contrary, assisted in his defense. Asked why in his capacity of constable he did not cause criminal charges to be placed against Meadows, Bowling replied, "He got permission from Herschel Ward to drive the truck,

and that's all right. * * * He wasn't stealing it."

■ Construing KRS 186.590(3) according to its plain meaning, liability would attach to Earl Bowling only if Meadows had his actual permission, express or implied, to use the truck on the occasion of the accident. Since this liability is purely statutory, not resting on the principle of respondeat superior, it seems doubtful that the theory of ratification could apply, but we need not decide the point, because we find nothing in the evidence to indicate that Bowling obtained or accepted any benefit from the use of his truck by Meadows or in any way evinced his approval of it. Surely his disinclination to pursue punitive measures against his young nephew could not reasonably be so construed. Meadows' subsequent operation of Bowling's other truck is simply irrelevant.

We are of the further opinion that even though Bowling may customarily have authorized Meadows to drive the truck for the purpose of Bowling's business, this circumstance alone would not support the inference that he had general permission to use it otherwise, and especially on a mission not for Bowling's benefit. Cf. United States Fidelity & Guaranty Co. v. Brann, 1944, 297 Ky. 381, 180 S.W.2d 102, 104.

Appellee cites a number of decisions from the federal and other courts construing the omnibus clause of liability insurance policies to cover sub-permittees. It must be recognized, however, that an insurance contract, written by the company and for which it is paid, is strictly construed against the insurer. What might be the result if this were an action on the omnibus clause of an insurance policy is a question not before us. Suffice it to say that the evidence does not establish a case of permissive use under KRS 186.590(3).

The judgment is affirmed as to the appellant Meadows. As to the appellants Earl and Ethel Bowling it is reversed with directions that judgment be entered dismissing the action.